ASH

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Abdul Wahab Adeli, et al., | No. CV-26-01949-PHX-DJH (ASB) |
| Petitioners, | **ORDER** |
| v. | |
| Eric Rokosky, et al., | |
| Respondents. | |

Petitioners—a group of nine individuals from various countries, all of whom have final orders of removal but who also all have been granted withholding of removal—challenged their ongoing detention pursuant to 28 U.S.C. § 2241 and *Zadvydas v. Davis*, 533 U.S. 678 (2001). (Doc. 1). By Order dated March 24, 2026, the Court ordered Respondents to show cause for why the Petition should not be granted. (Doc. 4). Much briefing has ensued. Four of the Petitioners have been granted relief and have been released from custody (Docs. 32, 33, 61, 63); two more have had temporary restraining orders entered enjoining their removal from the United States. (Docs. 38, 58). Respondents have responded to the Petition (Doc. 21), and Petitioners have replied. (Docs. 25, 29). Upon consideration of all of the filings and the exhibits included therewith, the Court now grants the Petition and will order that the remaining Petitioners be immediately released from custody.

. . . .

. . . .

### I.      Background

#### A.      Petitioner Rahmatullah

Petitioner Rahmatullah is a native of Afghanistan who entered the United States on February 11, 2025, and was immediately taken into custody. (Doc. 1 at 26). On November 21, 2025, an immigration judge (IJ) ordered Petitioner Rahmatullah removed to Afghanistan but granted withholding of removal pursuant to the Convention Against Torture (CAT); the IJ's order became final on December 25, 2025 when it was not appealed. (*Id.*). On December 24, 2025, February 26, 2026, and March 21, 2026, local ICE "reached out to HQ-RIO for assistance with a third country removal for Petitioner." (Doc. 21-3 at 3). On each occasion, they were advised "that there has been no change in status." (*Id.*).

As of the date of this Order, Petitioner Rahmatullah has been detained for more than six months since his order of removal became final.

#### B.      Petitioner Dima

Petitioner Dima is a native of Burkina Faso who entered the United States on July 21, 2024, and has been detained since August 2024. (Doc. 1 at 19). On August 28, 2025, an IJ ordered Petitioner Dima removed to Burkina Faso, but granted withholding of removal pursuant to 8 U.S.C. § 1231(b)(3); the IJ's order became final on August 28, 2025, when it was not appealed. (*Id.*). Beginning on August 29, 2025, the Department of Homeland Security (DHS) "pursued third-country removal to Ghana." (Doc. 21-7 ¶ 8). Petitioner Dima expressed fear of removal to Ghana; that fear was found to be credible, and his case was referred to an IJ for further consideration. (*Id.*). On January 8, 2026, Petitioner Dima "had an allocated seat" on a removal flight to Cameroon, but "[r]emoval was not effected due to ongoing court proceedings." (*Id.* ¶¶ 10-11). On March 6, 2026, the IJ granted Petitioner Dima withholding of removal to Ghana. (*Id.* ¶ 16).

As of the date of this Order, Petitioner Dima has been detained for approximately 10 months since his order of removal became final.

. . . .

### C.    Petitioner Njukeng

Petitioner Njukeng is a native of Cameroon who entered the United States on February 6, 2025, and was taken into custody in March 2025. (Doc. 1 at 25). On November 21, 2025, an IJ ordered Petitioner Njukeng removed to Cameroon, but granted withholding of removal pursuant to 8 U.S.C. § 1231(b)(3); the IJ's order became final on December 22, 2025, when it was not appealed. (*Id.*). On January 1, 2026, local ICE "contacted the Removal and Internation Operations Unit in Washington D.C. to assist with finding an alternate country of removal" for Petitioner Njukeng. (Doc. 21-8 ¶ 15). Respondents do not provide any indication that a response was ever received or identify any further efforts to effectuate Petitioner Njukeng's removal.

As of the date of this Order, Petitioner Njukeng has been detained for more than six months since his order of removal became final.

### D.    Petitioners Madadi and Lincura

Petitioner Madadi is a native of Iran who entered the United States on February 23, 2025, and was immediately taken into custody. (Doc. 1 at 23). On September 30, 2025, an IJ ordered Petitioner Madadi removed to Iran, but granted withholding of removal pursuant to the CAT; the IJ's order became final on October 30, 2025, when it was not appealed. (*Id.*). On December 10, 2025, local ICE "reached out to HQ-RIO for assistance with a third country removal." (Doc. 21-4 ¶ 14). On June 2, 2026, Respondents indicated that they were "prepared to remove Petitioner [Madadi] from the United States and intend[ed] to do so within the imminent immediate future, a time frame of the next two weeks." (Doc. 54-1 ¶ 4). Petitioner immediately sought an emergency temporary restraining order on the basis that Respondents had not told her where they intended to remove her or given her an opportunity to contest such removal, and, after the Court directed an expedited response from Respondents (Doc. 56), Respondents conceded to the entry of a time-limited restraining order to gather further information. (Doc. 57). Accordingly, the Court entered a temporary restraining order enjoining Petitioner Madadi's removal from the United States through June 19, 2026; this order was later extended

through July 3, 2026.  (Docs. 58, 66).  The Court further directed that "if Respondents intend to remove Petitioner [Madadi] to a third country, they must establish they have provided Petitioner [Madadi] with meaningful due process before doing so."  (Doc. 58 at 1-2).  As of June 16, 2026, Respondents indicated that they intend to remove Petitioner to Equatorial Guinea, but have not provided any information about what process, if any, has been provided to Petitioner Madadi to contest removal to that country.  (Doc. 67-1).  As of the date of this Order, Petitioner Madadi has been detained for approximately eight months since her order of removal became final.

Petitioner Lincura is a native of Chile who entered the United States on September 9, 2024, and was taken into custody in December 2024.  (Doc. 1 at 27).  In June 2025, an IJ ordered Petitioner Lincura removed to Chile, but granted withholding of removal pursuant to the CAT; the IJ's order became final on July 7, 2025, when it was not appealed. (*Id.*).  Beginning on September 10, 2025, local ICE "requested third country removal assistance from Headquarters Removal and International Operations (HQRIO) on four occasions."  (Doc. 21-9 ¶ 13).  On March 2, 2026, "HQRIO placed [Petitioner Lincura] on [a] third country removal list."  (*Id.* ¶ 14).  On March 18, 2026, Petitioner Lincura "was pre-approved for third country with flight scheduling pending."  (*Id.* ¶ 15).  On April 7, 2026, Petitioner Lincura sought an emergency temporary restraining order on the basis that he had been transferred out of this District to a "staging area for removal flight," but had not been told where Respondents intended to remove him or been given an opportunity to contest such removal.  (Doc. 23).  After this Court ordered an expedited response from Respondents (Doc. 35),[1] Respondents conceded to entry of a temporary restraining order enjoining Petitioner Lincura's planned removal.  (Doc. 36).  Accordingly, the Court entered a temporary restraining order enjoining Petitioner Lincura's removal.  (Doc. 38).  The Court further directed that "if Respondents intend to remove Petitioner [Lincura] to a third country, they must establish they have provided Petitioner [Lincura] with due process."

---

[1] Respondents filed a contemporaneous Notice that they "intend[ed] to remove Petitioner Lincura from the United States on April 15, 2026."  (Doc. 34).

(*Id.*).   On April 21, 2026, Respondents indicated that they had intended to remove Petitioner Lincura to the Democratic Republic of the Congo on April 15, 2026, but did not identify what process, if any, had been provided to him to contest removal to that country. (Doc. 46-1).   On May 20, 2026, Respondents indicated that they were in the process of returning Petitioner to a detention facility in Arizona, and that "there are currently no plans to remove him from the United States."   (Doc. 51 at 1).   As of the date of this Order, Petitioner Lincura has been detained for more than 11 months since his order of removal became final.

### E.    Petitioners Adeli, Etsang, Norouzi, and Ghadami

Petitioners Adeli, Etsang, Norouzi, and Ghadami have all been released from custody after Respondents conceded that they were entitled to relief. (Doc. 21 at 7; Doc. 60).

### II.    Motion to Sever

Respondents seek to sever this matter into individual proceedings for each Petitioner. (Doc. 16).   Respondents cite no authority requiring severance, and severance pursuant to Rule 21 is discretionary.   Fed. R. Civ. P. 21 ("On motion or on its own, the court *may* at any time, on just terms, add or drop a party.") (emphasis added).   Petitioners are not proceeding as a class and concerns about individualized factual determinations are not dispositive.   Petitioners are all represented by counsel, and the parties—including Respondents—have had no difficulty litigating this matter even on an expedited basis, nor has this Court had difficulty adjudicating multi-party habeas proceedings in the past.   (*See* Doc. 19 at 4) (collecting cases).   Accordingly, in its discretion, the Court will deny the Motion to Sever.

### III.    8 U.S.C. § 1231(a)

Under § 1231(a)(1), the Government has 90 days in which to remove an alien once a removal order becomes final.   Detention during this removal period is mandatory.   8 U.S.C. § 1231(a)(2).   If the Government is unable to effect removal within the 90-day removal period, however, continued detention of aliens such as Petitioner becomes

discretionary.  8 U.S.C. § 1231(a)(6).  That discretion, however, is not unfettered, and indefinite detention is not permitted.  *Zadvydas*, 533 U.S. at 689 (8 U.S.C. § 1231(a)(6) "does not permit indefinite detention.").  This is not to say that every alien like Petitioner must be released once the 90-day removal period has expired.  533 U.S. at 701.  Rather, the Supreme Court in *Zadvydas* recognized an implicit post-§ 1231(a)(2) period in which continued detention is "presumptively reasonable" and does not violate the Fifth Amendment.  *Id.*  The *Zadvydas* Court concluded that this "presumptively reasonable" period extends for no more than six months once an order of removal becomes final (including the 90-day mandatory detention period under § 1231(a)(2)).  *Id.*  Thereafter, "once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing."  *Id.*  If, after considering the evidence, the Court finds that "removal is not reasonably foreseeable, the court should hold continued detention unreasonable and no longer authorized by statute."  *Id.* at 699.

## IV.    Discussion

As an initial matter, the Court finds that Respondents have not discharged their obligations under the Court's March 24, 2026, Order to Show Cause (OSC) or 28 U.S.C. § 2243.  Title 28, section 2243 provides that when a court directs a respondent to show cause for why a writ pursuant to § 2241 should not be granted, the respondent "shall make a return certifying the true cause of the detention."  28 U.S.C. § 2243.  Echoing this statutory directive, the Court's March 24, 2026, OSC directed that "[a]ny response must be supported by documentary evidence including, if applicable, affidavits signed under penalty of perjury by individuals with personal knowledge of the factual statements made therein." (Doc. 4 at 2).

In their Response, Respondents provided nine Declarations from five different Deportation Officers (DOs). (Docs. 21-1 through 21-9).[2]  The Court does not find these

---

[2] Respondents provided additional declarations related to Petitioners Lincura and Madadi as part of briefing on those Petitioners' Motions for Temporary Restraining Orders,

Declarations credible, for multiple reasons. First, they all contain virtually identical language, suggesting that they were not prepared by each individual declarant.[3] Indeed, one of the Declarations includes track changes and comments. (*See* Doc. 21-2). Additionally, the three Declarations submitted by DO Marina Garcia Shaw were all signed within a nine-minute stretch on March 27, 2026; two of the Declarations were signed just 90 seconds apart. (*See* Docs. 21-3, 21-4, and 21-6). Similarly, two of the three Declarations submitted by DO David Michie III were signed less than three minutes apart. (*See* Docs. 21-1 and 21-9). Indeed, of the nine Declarations, six of them were signed over a roughly two-and-a-half hour stretch on March 27, 2026. (*See* Docs. 21-1, 21-2, 21-3, 21-4, 21-6, and 21-9). This confluence of commonality of language, existence of editing, and brevity of time over which the majority of the Declarations were signed suggests that they were provided *to* the Declarants, rather than prepared *by* them based on their personal knowledge.

Second, and more importantly, all of the Declarations state that the facts provided therein "were obtained by [the Declarants'] review of the file." (*See* ¶ 2 in all nine Declarations). Additionally, all of the Declarations further attest that they are only "a true and correct *summary* of the information *available*." (*See* ¶ 3 of all nine Declarations) (emphasis added). Each Declaration is thus doubly flawed, in that they attempt to summarize information—or, at most, whatever information was "available" to the declarants—for which they do not have personal knowledge. Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). At best, the declarants have personal knowledge as to the contents of whatever "file" they reviewed but are not qualified to attest that the events described therein actually occurred or are accurately reflected, much less so that their "summary" of them accurately reflects the totality of facts related

_____

discussed *infra*. (Docs. 46-1, 51-1, 54-1, and 67-1).

[3] The first three paragraphs of all nine Declarations are verbatim, with the exception of the name of the Petitioner and his or her A-number.

- 7 -

to each Petitioner's immigration proceedings. Respondents do not attach "the file" or any other documents to any of the Declarations, and the Declarations thus contain hearsay without an exception, violate the best evidence rule, and do not rely on authenticated evidence. *See* Fed. R. Evid. 802; Fed. R. Evid. 1002; Fed. R. Evid. 602; Fed. R. Evid. 901. Respondents have, therefore, produced no reliable or admissible evidence to contest the Petition.

For decades, courts have required that at least some competent evidence must be provided in a response to satisfy § 2243. *See e.g., Garcia v. Boldin*, 691 F.2d 1172, 1178-79 (5th Cir. 1982) (finding that response providing "a certified record of the administrative hearings which showed the true cause of detention and which substantially answered the factual allegations of the petition" to "substantially compl[y] with 28 U.S.C. § 2243"); *Marslin v. Schmucker*, 82 F.2d 765, 767 (4th Cir. 1937) (finding that response providing "a full and complete transcript of the entire record upon which the warrant of deportation was issued" to satisfy former 28 U.S.C. §§ 456, 457, and 458, now combined as 28 U.S.C. § 2243). A series of indistinguishable declarations providing only a "summary" of "available" facts allegedly contained in an undescribed "file" presented by declarants lacking personal knowledge cannot be said to be even minimally sufficient to satisfy the requirements of § 2243, and is facially noncompliant with the Court's March 24, 2026, Order to Show Cause. Such a response is deficient as a matter of law, and the Petition can thus be granted on this basis alone. 28 U.S.C. §§ 2241(c)(1), 2243.

In any event and as noted, as of the date of this Order, all of the remaining Petitioners have been detained for more than six months since their orders of removal became final. Under *Zadvydas*, their continued detention is thus no longer presumptively reasonable. As such, to obtain relief each Petitioner must first provide "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future," and, if they do so, Respondents "must respond with evidence sufficient to rebut that showing." *Id.* The Court finds that all of the Petitioners have done so here because they have all been granted withholding of removal. There is thus "good reason" to believe that there is no significant

likelihood of removal to their respective countries in the reasonably foreseeable future. *Id.* The burden thus shifts to Respondents to respond with evidence sufficient to rebut this showing.

Given that each Petitioner has been granted withholding of removal to their respective countries, the only possibility for removal is to third countries. The Court will address each remaining Petitioner in turn.

### A.    Petitioner Rahmatullah

As to Petitioner Rahmatullah, Respondents have not carried their evidentiary burden. As discussed, *supra*, Respondents have produced no reliable or admissible evidence to contest the Petition. Not withstanding that deficiency, since Petitioner Rahmatullah's order of removal became final on December 25, 2025, Respondents indicate only that local ICE "reached out to HQ-RIO for assistance with a third country removal for Petitioner" on three occasions (Doc. 21-3 at 3), and that on each occasion, they were advised "that there has been no change in status." (*Id.*). Respondents provide no evidence that they have even identified a third country for possible removal, much less that any such removal is significantly likely to occur in the reasonably foreseeable future.

On this record, Petitioner Rahmatullah is entitled to relief. *Zadvydas*, 533 U.S. at 689 (8 U.S.C. § 1231(a)(6) "does not permit indefinite detention.").

### B.    Petitioner Dima

As to Petitioner Dima, Respondents have also not carried their evidentiary burden. Notwithstanding the evidentiary deficiency discussed *supra*, since Petitioner Dima's order of removal became final on August 28, 2025, Respondents indicate that they "pursued third-country removal to Ghana," but after Petitioner Dima expressed fear of removal to Ghana, an IJ granted withholding of removal to Ghana on March 6, 2026. (Doc. 21-7 ¶¶ 8, 16). Respondents also indicate that on January 8, 2026, Petitioner Dima "had an allocated seat" on a removal flight to Cameroon, but "[r]emoval was not effected due to ongoing court proceedings." (*Id.* ¶¶ 10-11). In the more than six months since that apparent attempt, no other efforts to remove Petitioner to Cameroon—or any other

country—have been identified.

On this record, Petitioner Dima is entitled to relief.  533 U.S. at 689.

## C.    Petitioner Njukeng

As to Petitioner Njukeng, Respondents have also not caried their evidentiary burden. Notwithstanding the evidentiary deficiency discussed *supra*, since Petitioner Njukeng's order of removal became final on December 22, 2025, Respondents indicate that on one occasion they "contacted the Removal and Internation Operations Unit in Washington D.C. to assist with finding an alternate country of removal" for Petitioner Njukeng but apparently received no response.  (Doc. 21-8 ¶ 15).  Respondents provide no evidence that they have even identified a third country for possible removal, much less that any such removal is significantly likely to occur in the reasonably foreseeable future.

On this record, Petitioner Njukeng is entitled to relief.  533 U.S. at 689.

## D.    Petitioner Madadi

As to Petitioner Madadi, Respondents have not carried their evidentiary burden. Since Petitioner Madadi's order of removal became final on October 30, 2025, Respondents indicate that as of June 16, 2026, they intend to remove Petitioner to Equatorial Guinea, but have not provided any information about what process, if any, has been provided to Petitioner Madadi to contest removal to that country.  (Doc. 67-1). Despite this Court's order that "if Respondents intend to remove Petitioner [Madadi] to a third country, they must establish they have provided Petitioner [Madadi] with meaningful due process before doing so" (Doc. 58 at 1-2), Respondents have not addressed that factual question.  Rather, Respondents argue that Petitioner Madadi is foreclosed from seeking third country due process protections *in this court* but must instead seek it as part of the class identified in *D.V.D. v. United States Dep't of Homeland Sec.*, No. 25-10676-BEM (D. Mass).  (Doc. 67).

In *D.V.D.*, the Court certified a Rule 23 class consisting of the following:

> All individuals who have a final removal order issued in proceedings under Section 240, 241(a)(5), or 238(b) of the [Immigration and Nationality Act] (including withholding-only proceedings) whom DHS has deported or will

deport on or after February 18, 2025, to a country (a) not previously designated as the country or alternative country of removal, and (b) not identified in writing in the prior proceedings as a country to which the individual would be removed.

*D.V.D.* (D. Mass. Apr. 18, 2025). On February 25, 2026, the *D.V.D* court granted summary judgment in favor of the class, declaring that the Due Process Clause requires notice of the country to which a person is to be removed and opportunity to challenge removal to that country. *Id.* (Mar. 25, 2026). The government immediately sought an emergency stay of that ruling pending appeal in the First Circuit. *D.V.D. v. United States Dep't of Homeland Sec.*, No. 26-1212 (1st Cir. Mar. 5, 2026). On March 16, 2026, the First Circuit granted that motion. *Id.* The appeal remains pending as of the date of this Order.

Neither *D.V.D.* nor the First Circuit's ultimate resolution of its appeal are binding precedent on this Court. Rather, the sole relevant question here is whether Petitioner Madadi is foreclosed from seeking due process protections in this Court related to third country removal while also being a member of the *D.V.D.* class. The Court concludes that she is not so foreclosed.

In *Crawford v. Bell*, the Ninth Circuit held that a district court may dismiss "those portions of [the] complaint which duplicate the [class action's] allegations and prayer for relief," but may not "dismiss[] those allegations of [the] complaint which go beyond the allegations and relief prayed for in [the class action]." 599 F.2d 890, 892-93 (9th Cir. 1979). Similarly, in *Pride v. Correa*, the Ninth Circuit held that "a district court may decline to exercise its jurisdiction over a [] prisoner's claim seeking *systemic* injunctive relief … where the allegations and relief sought are duplicative of [a class action]." 719 F.3d 1130, 1137 (9th Cir. 2013).

Here, Petitioner Madadi seeks habeas relief as to her detention, and, with respect to her Motion for Temporary Restraining Order, injunctive relief as to her removal to a third country. This is wholly distinct from the relief granted on summary judgment in *D.V.D.* There, the only relief granted was declaratory. *D.V.D. v. United States Dep't of Homeland Sec.*, No. 25-10676-BEM (D. Mass. Mar. 25, 2026). Petitioner Madadi does not seek

declaratory relief; she seeks release from custody and to enjoin her removal to a third country without due process.  Similarly, Petitioner Madadi does not seek systemic relief; her requested relief is wholly individual and has no preclusive effect on any other litigant. There is no overlap of claims or relief sought between the instant action and that in *D.V.D.*

Respondents contend that individual consideration of Petitioner Madadi's claims despite her membership in the *D.V.D.* class "would undermine what Rule 23 was intended to ensure: consistency of treatment for similarly situated individuals," and "would also open the floodgates of parallel litigation in district courts all over the country which could ultimately threaten the certification of the underlying class by creating differences among the class members." (Doc. 21 at 19).  Respondents' concern for the sanctity of the *D.V.D.* class rings hollow, however, in light of, first, their motion to sever—in which they argue that "Petitioners have very little in common save that they are all detained at the Eloy Detention Center" and "[e]ach of Petitioners' claims require a highly individualized analysis" (Doc. 16 at 1, 3)—and, second, the government's argument on appeal in *D.V.D.* that "the class was improperly certified" because it "is comprised of aliens with a near infinite number of different backgrounds critical to a due process analysis and for which it is impossible to account."  *D.V.D. v. United States Dep't of Homeland Sec.*, No. 26-1212 (1st Cir. Mar. 30, 2026, at 70).  The Court is unable to reconcile Respondents' professed desire to maintain "consistency of treatment for similarly situated individuals" with their simultaneous argument that those same individuals "have very little in common" and, in fact, should not even be considered a class at all.

In any event, properly unshackled from *D.V.D.*, the Ninth Circuit has held that "[f]ailing to notify individuals who are subject to deportation that they have the right to apply ... for withholding of deportation to the country to which they will be deported violates both INS regulations and the constitutional right to due process." *Andriasian v. I.N.S.*, 180 F.3d 1033, 1041 (9th Cir. 1999) (citing *Kossov v. I.N.S.*, 132 F.3d 405, 408–09 (7th Cir. 1998)); *see also Sadychov v. Holder*, 565 Fed. App'x 648, 651 (9th Cir. 2014) ("[S]hould circumstances change such that Azerbaijan is the designated country of

removal, the agency must provide Sadychov with notice and an opportunity to reopen his case for full adjudication of his claim of withholding of removal from Azerbaijan.”). “In the context of country of removal designations, last minute orders of removal to a country may violate due process if an immigrant was not provided an opportunity to address his fear of persecution in that country.” *Najjar v. Lynch*, 630 Fed. App'x 724 (9th Cir. 2016) (citing *Andriasian*, 180 F.3d at 1041); *El Himri v. Ashcroft*, 378 F.3d 932, 938 (9th Cir. 2004).

Here, Respondents have not identified any process which they intend to provide to Petitioner Madadi prior to removing her to Equatorial Guinea.  Instead, Respondents avow that “Petitioner is expected to be removed to Equatorial Guinea pursuant to a Third Country Removal Agreement [TCRA] that the Department of State signed with the Government of Equatorial Guinea.”  (Doc. 67-1 ¶ 4).  Respondents further avow that “Equatorial Guinea provided diplomatic assurances that the aliens removed from the United States pursuant to the [TCRA] will not be subjected to persecution or torture,” and that “the Department of State determined that the diplomatic assurances were credible.”  (*Id.* ¶ 5).  Finally, Respondents avow that they “will follow the March 30th, 2025, memorandum from former DHS Secretary Kristi Noem, *Guidance Regarding Third Country Removals*, to effectuate the Petitioner's removal.” (*Id.* ¶ 8).  That memorandum provides that “[i]f the United States has received such assurances, and if the Department of State believes those assurances to be credible, the alien may be removed without the need for further procedures.”  (Doc. 46-2 at 1-2).  As such, it does not appear that Respondents intend to offer any process by which Petitioner Madadi can challenge her removal to Equatorial Guinea.

Removal to a country which Respondents alone have deemed safe, and to which Petitioner has no ability to contest, is insufficient under *Andriasian*.  Absent any evidence that Respondents are significantly likely to be able to legally remove Petitioner Madadi in the reasonably foreseeable future, she is entitled to relief.  Put simply, unconstitutional removal cannot cure unconstitutional detention.  *Zadvydas*, 533 U.S. at 689; *Andriasian*, 180 F.3d at 1041.

### E.    Petitioner Lincura

As with Petitioner Madadi, Respondents have also failed to demonstrate that proper removal of Petitioner Lincura is significantly likely to occur in the reasonably foreseeable future.  Indeed, Respondents concede that, as of May 20, 2026, "there are currently no plans to remove [Petitioner Lincura] from the United States." (Doc. 51).  As such, for the same reasons as those discussed in Part IV.D, *supra*, Petitioner Lincura is also entitled to relief.

### V.    Conclusion

The Supreme Court held in *Zadvydas* that as the period of detention grows, "what counts as the 'reasonably foreseeable future' would have to shrink."  533 U.S. at 701.  As noted, Petitioners have all now been detained beyond the presumptively reasonable period identified in *Zadvydas*, and having provided "good reason" to support that their removals are not significantly likely to occur in the reasonably foreseeable future, the burden shifts to Respondents to rebut that showing with sufficient evidence.  *Id*.  Respondents have failed to do so.  Accordingly, the Court finds that Petitioners' continued detentions are in violation of the Fifth Amendment and will thus grant the Petition and order the remaining Petitioners to be immediately released from detention.  The Court will additionally extend the temporary restraining orders as to Petitioners Lincura and Madadi until Respondents file notice that they have been released from detention.[4]

**IT IS ORDERED:**

(1)    Respondents' Motion to Sever (Doc. 16) is **denied**.

(2)    The Petition for Writ of Habeas Corpus (Doc. 1) is **granted**.

(3)    Respondents must **IMMEDIATELY RELEASE** Petitioners Rahmatullah,

---

[4] The Court declines Petitioners' invitation to extend this same injunctive relief to the remaining Petitioners.  (Doc. 68 at 8 n.1) ("this Court should also enter a prospective order requiring Respondents to comply with the requirements of due process.").  As an initial matter, permanent injunctive relief was not requested in the Petition, and Petitioners have not separately moved for such relief.  Fed. R. Civ. P. 65.  Further, the argument that the Petitioners will be re-detained and removed to a third country without due process, while plausible, remains speculative at this juncture.

- 14 -

Dima, Njukeng, Madadi, and Lincura from custody.

(4)    No more than **48 HOURS** from the time of this Order, Respondents must file a notice of compliance.

(5)    The Temporary Restraining Orders issued in Docs. 38, 58, and 66 are **EXTENDED** until Respondents file the above-required notice of compliance.  The Clerk of Court is directed to **term** the pending flag on Docs. 23 and 55.

(6)    The Motion for Extension of Time (Doc. 17) and Motion for Status Conference (Doc. 48) are **denied as moot**.

(7)    Any motion for fees and costs pursuant to 28 U.S.C. § 2412 shall be filed within 30 days of final judgment.  *See* 5 U.S.C. § 504; 28 U.S.C. § 2412(d)(1)(B), (d)(2)(g).

(8)    The Clerk of Court must enter judgment accordingly, and close this case.

Dated this 29th day of June, 2026.

Honorable Diane J. Humetewa
United States District Judge